J-A28031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| GLENN EDWARD TETRO | : | |
| | : | |
| Appellant | : | No. 1404 WDA 2019 |

Appeal from the Judgment of Sentence Entered July 16, 2019
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s):  CP-33-CR-0000227-2018

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED: APRIL 9, 2021**

Glenn Edward Tetro (Appellant) appeals from the judgment of sentence imposed in the Jefferson County Court of Common Pleas, following his jury conviction of rape, involuntary deviate sexual intercourse (IDSI),[1] and related offenses for the repeated sexual abuse of his stepdaughter when she was six to 10 years old.  Appellant argues:  (1)  the verdict was against the weight of the evidence, (2)the trial court abused its discretion when it admitted several prior consistent statements made by the victim, and (3) his three convictions of IDSI should have merged with his convictions of rape for sentencing

_____

[1] **See** 18 Pa.C.S. §§ 3121(a)(6), 3123(a)(6).  Sections 3121(a)(6) and 3123(a)(6) were deleted in 2002, and replaced by Sections 3121(c), "Rape of a child," and 3123(b), "Involuntary deviate sexual intercourse with a child." **See** 2000, Dec. 9, P.L. 1350, No. 162, § 2, effective in 60 days.  Because the abuse at issue occurred from 1995 until 1998, Appellant was convicted under the prior statutes.

purposes. Because we agree Appellant's convictions of IDSI merged with his convictions of rape for purposes of sentencing, we vacate the judgments of sentence on those counts. In all other respects, we affirm.

The facts, as developed during Appellant's jury trial, are as follows. The victim, S.M., was "[a]lmost six" years old in August of 1994, when Appellant married her mother, L.T. N.T., 1/29/19, at 64, 187. Appellant was 32 years old at the time; both he and L.T. were continuing education students at Clarion University. *Id.* at 187, 189. The next summer, the family moved to a home in Summerville, Pennsylvania. *Id.* at 188. After graduating from Clarion, Appellant received a Master's Degree in "counseling psychology." N.T., 1/30/19, at 71. He has worked with troubled teens since his mid-20's. *Id.* at 66. L.T. also has an older son, S.M.'s brother. N.T., 1/29/19, at 63. Appellant and L.T. have two biological daughters, S.M.'s half-sisters. *Id.*

S.M. testified that "[r]ight after" her mother and Appellant were married — when she was five or six years old — Appellant began sexually assaulting her.[2] *Id.* at 69. She recalled the incidents occurred both during the daytime and the evening in the TV room, and her bedroom. *Id.* at 68-70. S.M. testified to one specific incident during which she was on top of Appellant in the TV room, and he was "licking [her] vagina" while she was "licking around his penis." *Id.* at 70. She also recalled three other specific incidents of oral

---

[2] The amended criminal information charged Appellant with sexually molesting S.M. from the ages of seven through ten. *See* Appellant's Amended Criminal Information, 1/28/19.

sex: (1) after they moved into their house in Summerville, Pennsylvania; (2) when Appellant graduated from college, and (3) when L.T. graduated from college. *Id.* at 71-72. She explained each incident occurred in the TV room, while she was watching TV. *Id.* at 71-72. S.M. also testified she would give Appellant a "hand job where [she] would be sticking [her] hands down his pants and stoking his penis." *Id.* at 73. These acts would occur "[s]ometimes . . . a couple times a day." *Id.* She explained: "I felt like I was programmed to do it. So it just came naturally just to go crawl under the covers with him on the couch and proceed doing those acts." *Id.* at 74. S.M. testified the abuse stopped when her half-sister was born in 1988; at the time, she was "[n]ine going on ten[.]" *Id.* at 78.

S.M. acknowledged she did not report the abuse to police until August of 2017, when she was 29 years old. N.T., 1/29/19, at 79. She testified, however, that she first realized what Appellant had done was inappropriate after taking a sex education class in school when she was 15 years old. *Id.* at 82, 122. S.M. tried to tell her mother about the abuse at that time, but was unable to do so; she told L.T. only that Appellant "wanted [her] to touch him." *Id.* at 83, 124. *See also id.* at 193 (L.T. testified S.M. told her she had a "memory or a dream . . . of [Appellant] wanting her to touch him"). L.T. took S.M. and her siblings to a hotel for the night so that she could continue to question S.M. *Id.* at 83, 195. However, S.M. "emotionally shut down." *Id.* at 83. She explained:

I was still afraid. I didn't want to be the girl that broke up a marriage, a family because . . . my mom and dad were divorced, and I didn't want to be the reason for my sisters having to go without a mom and father.

*Id.* at 84.

L.T. testified that she spoke with Appellant on the phone, and told him S.M. "said that you made her touch you." N.T., 1/29/19, at 195. She claimed Appellant responded that "one night while he was tucking [S.M.] in bed that she reached up and tried to touch him and that he stopped her and said, We don't do this." *Id.* at 196. The next morning, L.T. returned home with the children. *Id.* at 197. Both S.M. and L.T. testified this incident occurred in 2004, when S.M. was 15 years old.[3] *See id.* at 125, 206.

S.M. also testified that she disclosed the abuse to two friends and her former boyfriend while she was in high school. *See* N.T., 1/29/19, at 81-82. All three friends testified at trial and corroborated S.M.'s claim. *See id.* at 150-52 (C.W. recalled sitting in a stairwell in high school with S.M. in "eighth or ninth grade" when she revealed Appellant "forced her to perform oral sex"); 166 (S.C. recalled S.M. telling her between "10th and 11th grade" that Appellant "molested her when she was younger"); 177, 181 (J.R. recalled when S.M. and he were "dating back in high school," she told him "that she was molested by her stepfather when she was young"). S.M. acknowledged

---

[3] We note, however, Appellant testified the hotel incident occurred in 1998 or 1999. *See* N.T., 1/30/19, at 81.

the first time she told investigators about these witnesses was in January of 2019, after jury selection in this case. *See id.* at 141, 143, 144-45.

Following the hotel incident, Appellant and L.T. started a non-profit, outpatient clinic, Brookville Behavioral Health. N.T., 1/29/19, at 207-08; 1/30/19, at 82. Appellant testified that the "stress involved with running the company" took a toll on their marriage. N.T., 1/30/19, at 82. L.T. filed for divorce in 2008. N.T., 1/29/19, at 209. Both Appellant and L.T. agreed the divorce was contentious; they fought over everything, but in particular, custody of their two minor daughters. *Id.* at 210 (L.T. explaining they fought "[r]uthlessly" over custody); N.T., 1/30/19, at 87 (Appellant describing, "[i]t was like the divorce from hell that kept getting worse"). In fact, the divorce was not finalized until 2015. *See* N.T., 1/29/19, at 65; N.T., 1/30/19, at 89.

Initially, L.T. received custody of her two daughters with Appellant. N.T., 1/29/19, at 128; N.T., 1/30/19, at 91. However, in 2011, following an incident at L.T.'s home, Appellant filed a petition for emergency custody. N.T., 1/29/20, at 210; N.T., 1/30/19, at 92-93. That same year, S.M. told her mother, for the first time, about the sexual abuse. N.T., 1/29/19, at 129. As a result of the emergency custody petition, the court ordered all the children to be evaluated by Dr. Zaffy.[4] *Id.* S.M. testified that she revealed to Dr. Zaffy that she had been sexually abused by Appellant. *Id.* at 129-30. Nevertheless, Appellant was awarded custody of her two half-sisters. N.T., 1/30/19, at 94.

---

[4] Dr. Zaffy's first name does not appear in the record.

Both S.M. and L.T. acknowledged they did not report the abuse to the police at that time.  N.T., 1/29/19, at 132, 213-14.

In August of 2017, S.M. reported the sexual abuse to Pennsylvania State Trooper Derek Weaver, who testified at trial.  N.T., 1/29/19, at 133; N.T., 1/30/19, at 16.  After interviewing S.M. and her mother L.T., Trooper Weaver decided to conduct a "consensual wire interception" between S.M. and Appellant.  N.T., 1/30/19, at 18.  He explained:  "a consensual wire interception is a technical term for a recorded telephone call where one party [has] given consent . . . and is aware that the telephone call communication is being recorded."  *Id.*  Thereafter, S.M. made two recorded telephone calls to Appellant, one on February 20, 2018 and the second on February 27, 2018.  *Id.* at 20.  Both recorded telephone calls were played for the jury at trial.  *See* N.T., 1/29/19, at 97, 105.

During the recorded calls, Appellant made several incriminating statements.  In the first call, S.M. asked Appellant:  "Did you love me, or was it a sexual thing?"  N.T., 1/29/19, at 97.  Appellant responded:  "I don't know if you remember the night I said, Sorry, honey, we can't do this anymore.  . . . Young ladies don't do this.  I want you to grow up to be a beautiful young lady."  *Id.* at 97-98.  Following the first call, S.M. and Appellant engaged in a texting conversation.  *See id.* at 100-02.  During that conversation, Appellant suggested S.M. get "online counseling" and offered to give her "some pre paid Visa cards [so she could] keep [her] identity private."  *Id.* at 102.  He also stated:  "[I]t seems like mental health workers can be worse gossips than old

- 6 -

church ladies." *Id.* This texting conversation was also provided to the jury. *See id.* at 101. During the second recorded phone call, S.M. pointedly asked Appellant if "all [they] did" was "oral sex and hand jobs." N.T. 1/30/19, at 104. Appellant answered: "Yep. Uh-huh. Pretty much." *Id.* When she asked him "why it happened," he responded, "Because I let it happen." *Id.* at 103. At one point, Appellant mentioned "wanting to hurt" himself. *Id.*

The Commonwealth also admitted, and played for the jury, an audio recording of Appellant's post-arrest police interview. *See* N.T., 1/30/19, at 25-27. During that interview, Appellant described S.M. as "having highly sexualized behavior from the time she first came into [his] life." *Id.* at 112.

Appellant testified in his own defense at trial, and denied all allegations of abuse. *See* N.T., 1/30/19, at 111. He claimed S.M. "seemed to be obsessive with her private parts" when she was young, and masturbated both at home and in public. *Id.* at 73. Appellant also described an incident in which S.M. walked in on him masturbating. *Id.* at 76. With regard to the hotel incident, Appellant agreed L.T. took the children away overnight, and left him a note stating S.M. was having "flashbacks . . . of what [he] did to her as a child." *Id.* at 78. He claimed, however, that they "had a pretty severe fight over financial issues" shortly before that incident. *Id.* at 79. He denied any abuse, and emphasized that L.T. returned home the next day. *Id.* at 80.

Appellant claimed that during the contentious divorce proceedings, L.T. told him if he "didn't give her what she wanted that she was going to have

[S.M.] tell the Court that [he] molested her as a child." N.T., 1/30/19, at 89. He further testified that the allegations in Dr. Zaffy's report was the first time he was aware S.M. was accusing him of oral sex. *Id.* at 94.

With regard to his recorded telephone conversations with S.M., Appellant testified his therapist "training kicked in" and he permitted S.M. to "confront[ ] her abuser" rather than deny the allegations of abuse. N.T., 1/30/19, at 97 (Appellant stating, "us in psychology . . . live by the do no harm principle"). Appellant explained: "The worst thing you can do when somebody has an accusation of something like this or even a belief is to tell them that they're a liar or not believe them." *Id.* at 97-98. He acknowledged that, in the first call, he told S.M. that "[i]t might be a sticky situation if she says who she is" because "the mere allegation of [him] doing something like that would destroy [him]." *Id.* at 98. Appellant claimed, however, that he was "more concerned" about S.M., and was convinced his ex-wife, L.T., was behind the allegations. *Id.* at 100.

As for the second call, Appellant acknowledged that he spoke about wanting to hurt himself, but claimed he was using his "victim empathy training" because it was "important for the [therapist] to express how sorry they were that this happened." N.T., 1/30/19, at 103. He also explained why, when S.M. asked him "why it happened," he responded "[b]ecause I let it happen:"

> . . . I'm guessing that was alluding to the importance that the individual who is being confronted take full responsibility for what

happened so the child doesn't feel any self-blame or in the case with an adult survivor any self-blame of what happened.

*Id.* Further, Appellant conceded that when S.M. asked him if "all [they] did" was "oral sex and hand jobs," he responded, "Yep. Uh-huh. Pretty much." *Id.* at 104. However, he testified that as a therapist, "you always operate within the context of the belief system of the individual that you're dealing with [and] always believ[e] the individual." *Id.* Appellant conceded both telephone calls "sound pretty bad." *Id.* at 101.

Appellant was arrested and charged with multiple sexual offenses. He proceeded to a jury trial on January 29, 2019, on 47 offenses: five counts each of rape (less than 13 years old), IDSI (less than 13 years old), and statutory sexual assault, and 32 counts of indecent assault (less than 13 years old).[5] The next day, the jury found Appellant guilty of three counts each of rape, IDSI and statutory sexual assault, and four counts of indecent assault. The jury acquitted Appellant of the remaining offenses.[6] The trial court ordered both a presentence investigation report and an assessment by the Sexual Offenders Assessment Board to determine if Appellant met the requirements for classification as a sexually violent predator (SVP).[7] *See* Order, 1/30/19; Order for Assessment, 1/30/19.

_____

[5] 18 Pa.C.S. §§ 3122.1, 3126(a)(7).

[6] The jury acquitted Appellant of the incident in the TV room, where S.M. described them performing oral sex on each other.

[7] *See* 42 Pa.C.S. § 9799.58.

On July 15, 2019, the trial court conducted a combined SVP/sentencing hearing. The court first determined that Appellant did not meet the criteria for classification as an SVP. *See* N.T., 7/15/19, at 16; Order 7/17/19. The court then proceeded to sentence Appellant to an aggregate term of 21 to 80 years' imprisonment. Specifically, the court imposed (1) consecutive sentences of six to 20 years' incarceration for each count of the three counts of rape, (2) concurrent terms of six to 20 years for each of the three counts of IDSI, (3) concurrent terms of one and one-half to 10 years for each of the three counts of statutory sexual assault, and (4) consecutive terms of nine months to five years for each of the four counts of indecent assault. Appellant filed a timely post-sentence motion, which the trial court denied on August 5, 2019. This timely appeal follows.[8]

Appellant raises three issues on appeal, which we have reordered for purposes of disposition:

> I.    Did the trial court abuse its discretion by finding that a guilty verdict was not against the weight of the evidence when the unreliable testimony of the complainant at trial, the only person with firsthand knowledge of a crime, was so vague and untrustworthy that to base a verdict on her testimony was manifestly unreasonable and shocking to the conscience?
>
> II.   Did the trial court abuse its discretion and commit prejudicial error by admitting hearsay evidence of the complainant's friends as substantive evidence to rehabilitate

---

[8] Appellant complied with the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

the complainant's testimony when she made the statements after her motive to lie existed?

III.   Did the sentencing court impose an illegal sentence by failing to merge the three counts of rape and the three counts of IDSI based on three criminal acts?

*See* Appellant's Brief at 17 (some capitalization omitted).

In his first issue Appellant challenges the weight of the evidence supporting his convictions.[9]   "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Miller*, 172 A.3d 632, 643 (Pa. Super. 2017) (citation omitted).   We must bear in mind that "[r]esolving contradictory testimony and questions of credibility are matters for the finder of fact." *Id.* at 642 (citation omitted).   Thus,

> [w]hen a trial court evaluates a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail."
>
> On appeal, the inquiry differs.   When it considers a weight claim, an appellate court must review the trial court's exercise of discretion.   "A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court."   "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." **We do not contemplate the underlying question of whether the verdict actually was against the weight of the evidence. Rather, we evaluate the trial court's decision of that issue, and we do so under an abuse of discretion standard.**

---

[9] Appellant properly preserved his weight claim in his timely filed post-sentence motion.  *See* Pa.R.Crim.P. 607(A)(3).

*Commonwealth v. Clemons*, 200 A.3d 441, 463–64 (Pa. 2019) (citation omitted; emphasis and paragraph break added), *cert. denied*, 140 S. Ct. 176 (2019). Furthermore,

> "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence."

*Miller*, 172 A.3d at 643 (citation omitted).

Here, Appellant insists the jury's verdict was against the weight of the evidence because S.M., "the only witness who testified with first-hand knowledge of the misconduct, presented vague and questionable testimony and she had motivations to allege misconduct due to a contentious divorce and custody battle between [Appellant] and her mother." Appellant's Brief at 53. Appellant emphasizes: (1) the lack of "physical evidence to corroborate [S.M.'s] story[;]" (2) S.M.'s "motive to make up a story against" Appellant to support her mother in the custody dispute; (3) the fact Dr. Zaffy apparently did not believe her allegations;[10] and (4) his own opinion, "based on his psychological training, that [S.M.] had been manipulated by her mother to believe that [he] abused her." *Id.* at 55-56. Further, Appellant maintains the testimony of S.M.'s friends, in whom she purportedly confided about the

---

[10] Appellant maintains "[o]ne can infer . . . Dr. Zaffy did not believe [S.M.'s] allegations since . . . the court system awarded [Appellant] custody of his daughters and no criminal charges ever came from [that] interview[.]" Appellant's Brief at 57.

abuse, was also "unreliable." *Id.* at 60. Finally, Appellant summarizes his own "credible and consistent" testimony — including "why he affirmed [S.M.'s] story of abuse" during the recorded telephone calls. *See id.* at 61-64.

The trial court, however, determined the verdict was not against the weight of the evidence. The court opined:

> It is nothing more than witness credibility [Appellant] attacks with respect to each Commonwealth witness[.] Each point he makes to cast doubt on a witness's reliability, trustworthiness, or bias was brought to the jury's attention at trial[.] Each juror knew that the victim had waited many years before disclosing her secret to anyone other than her school friends. Each juror knew that she did not provide the names of those friends to the prosecution until January of 2019. Each juror knew, moreover, that [Appellant] and the victim's mother had gone through a protracted and acrimonious divorce and custody battle. In every instance, each juror had the opportunity to observe the witnesses' demeanor, and consider their explanations as to timing, any apparent inconsistencies, and their motives for testifying against [Appellant]. As a body, the jury simply weighed the evidence in favor of the Commonwealth. . . .

Trial Ct. Op., 2/19/20, at 2-3.

Appellant fails to explain why the trial court's ruling constitutes an abuse of discretion. Each criticism he makes of the Commonwealth's case against him is readily explained. Indeed, there is often only one witness (the victim) in a sexual abuse case involving a child, and often no corroborating physical evidence — particularly when, as here, the abuse occurred long before it was reported to police. Although Appellant emphasizes S.M.'s purported motive to fabricate the abuse to support her mother in the custody dispute, the record reveals she told her friends about the abuse before the parties separated, and

she did not immediately report the abuse to the police when Appellant received custody of her sisters in 2011. Rather, she waited several more years, until 2017, to report the abuse to the police. Furthermore, as the trial court notes, Appellant "admitted the abuse in a recorded telephone call that the jury heard[.]" Trial Ct. Op. at 2 n.1. Although Appellant attempted to characterize these admissions as "him exercising his mental health training and purporting to give credence to [S.M.'s] allegations[,]" the jury was well within its province to reject **his testimony** as incredible. ***See id.*** Our review of the record reveals no abuse of discretion on the part of the trial court in rejecting Appellant's weight of the evidence claim. ***See Clemons***, 200 A.3d at 464. Accordingly, Appellant's first claim fails.

Next, Appellant contends the trial court erred when it admitted hearsay testimony regarding S.M.'s prior consistent statements, when the statements were made after S.M.'s motive to lie existed. ***See*** Appellant's Brief at 44. Appellant insists S.M.'s statements to her high school friends were made "**after** [he] threatened her mother with divorce and custody discussions . . . had occurred." ***Id.*** at 47 (emphasis added). Furthermore, Appellant argues the "hearsay was presented during the Commonwealth's case-in-chief as substantive evidence" rather than for rehabilitative purposes during rebuttal. ***Id.*** at 48. Lastly, Appellant maintains the court's ruling was "not harmless error since the numerous witnesses bolstering [S.M.'s] allegations likely affected the jury in a case based on the credibility of the complainant." ***Id.*** at 51.

Our review of a trial court's evidentiary rulings is well-established:

The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. Thus our standard of review is very narrow. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Commonwealth v. Bond***, 190 A.3d 664, 667 (Pa. Super. 2018) (citation omitted). "Error is harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict." ***Commonwealth v. Lively***, 231 A.3d 1003, 1009 (Pa. Super. 2020) (citations omitted). Moreover, we note an appellate court may affirm a trial court's ruling on any basis. ***Commonwealth v. Allshouse***, 36 A.3d 163, 182 (Pa. 2012).

The admission of a witness's prior consistent statement is governed by Pennsylvania Rule of Evidence 613(c), which provides, in pertinent part:

**(c) Witness's Prior Consistent Statement to Rehabilitate.** Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose[.]

Pa.R.E. 613(c)(1). Thus, pursuant to subsection (c)(1), the prior statement must have been made **before** the alleged "fabrication, bias, improper

influence or motive, or faulty memory." Pa.R.E. 613(c)(1). **See Commonwealth v. Baker**, 963 A.2d 495, 505 (Pa. Super. 2008) (concluding video of child victim's interview with forensic pediatrician was admissible as prior consistent statement when defense "insinuated" that victim's trial testimony was "fabricated" by Commonwealth and victim's mother). Furthermore, "[a] prior consistent statement, if admissible at all, is admissible only as rebuttal or rehabilitation but as not substantive evidence." **Bond**, 190 A.3d at 668 (citation omitted).

In the present case, Appellant challenged the proposed testimony of Appellant's high school friends in an oral motion in *limine* presented on the first day of trial. **See** N.T., 1/29/19, at 10. Because there was some dispute as to the dates of these prior statements, the trial court reserved ruling on the motion until after S.M.'s testimony. **See id.** at 12. However, upon listening to the parties' opening statements, the court determined the prior consistent statements were admissible. The court interpreted the rule to require the prior statement to be made before the victim "went to the authorit[ies.]" **Id.** at 57. In this case, the court determined that to be 2012, when S.M. told Dr. Zaffy about the abuse. **See id.** Because the statements at issue were made prior to 2012, the court ruled they were admissible. **Id.**

Appellant contends that this interpretation of Rule 613 is erroneous. **See** Appellant's Brief at 46-47. We agree. The Rule requires that the prior statement must have been made "before that which has been **charged**[.]" Pa.R.E. 613(c)(1) (emphasis added). Focusing on the word "charged," the

court found this referred to the criminal charges. However, reading the Rule as a whole, it is clear the "charge" referred to in Subsection (c)(1) is the "express or implied **charge** of . . . fabrication[.]" ***Id.*** (emphasis added). Thus, as this Court has explained, "the prior consistent statement must have been made before the **motive to lie** existed." ***Bond***, 190 A.3d at 668 (citation omitted and emphasis added).

Nevertheless, in its opinion, the trial court properly interpreted the Rule 613 as requiring the prior consistent statement to have been made before the motive to fabricate the allegations existed. The court opined:

> [The fact that the court] did not err . . . was borne out by the facts to which the witnesses testified. It was 2008 when [Appellant] and the victim's mother first separated, and the victim was a 20-year-old high school graduate at the time. Yet she was still in middle- or high-school when she mentioned the abuse to [C.W.], [S.C.], and [J.R.], which was years before her mother and [Appellant] first separated. That being the case, Rule 613 and interpretative case law allowed the witnesses to testify as they did since [Appellant] was challenging the victim's motive to accuse him.

Trial Ct. Op. at 2.

Upon our review of the record, we agree. Appellant alleges S.M.'s motive to fabricate the abuse allegations was her mother's divorce from, and subsequent custody battle with, Appellant. He asserts, however, that the statements S.M. made to her friends in high school were made "**after** [he] had threatened her mother with divorce and custody discussions . . . had occurred." Appellant's Brief at 47 (emphasis added). In support, Appellant cites both L.T.'s and his own testimony concerning the hotel incident.

L.T. testified that when she returned home the next day, Appellant "accus[ed her] of trying to ruin his career, getting leverage in custody and whatnot. And he said, If anything ever becomes of this . . . I'm just going to say you knew it all along." N.T., 1/29/19, at 197-98. Appellant testified that "not too long" before the hotel incident, they "had a pretty severe fight over financial issues." N.T., 1/30/19, at 79. He explained he wanted to purchase a rental property, but L.T. was "way not in agreement . . . [a]nd [he] told her, Sign the damn house paper or sign divorce papers[.]" *Id.* Shortly after that incident, Appellant and L.T. opened Brookville Behavioral Health which took a toll on their marriage. *Id.* at 82. However, Appellant acknowledged that neither party filed for divorce until four years later, in 2008. *Id.* at 86.

Thus, although Appellant attempts to paint a picture of a rocky marriage, with years of threats concerning child custody, the record does not support a claim that **S.M. had a motive** to fabricate the abuse allegations before L.T. filed for divorce in 2008. Indeed, there was no testimony that — assuming the marriage was strained — S.M. had any knowledge of that. In fact, she testified the reason she did not want to tell her mother about the abuse in 2004 was because she "thought [L.T.] was happy in her marriage, and [she] didn't want to be the person that broke them up." N.T., 1/29/19, at 81. Accordingly, we detect no abuse of discretion on the part of the trial court in determining S.M.'s prior consistent statements to her friends during high school predated her purported motive to fabricate the allegations of abuse.

Appellant also argues, however, that court erred by permitting the Commonwealth to present this evidence during its case-in-chief. **See** Appellant's Brief at 48. He maintains prior consistent statements are only admissible "for rehabilitative purposes" in rebuttal. **Id.** at 48-49. **See Bond**, 190 A.3d at 668.

Appellant is entitled to no relief. Our Supreme Court has explained:

> Although [prior consistent] statements should . . . be introduced as rebuttal evidence, where the defense is centered upon attacking a witness's credibility consistent with a basis that would permit introduction of a prior consistent statement to rehabilitate, the trial court is afforded discretion to allow anticipatory admission of the prior statement.

**Commonwealth v. Wilson**, 861 A.2d 919, 930 (Pa. 2004). Here, it was clear from the outset of trial that Appellant's defense was that S.M. fabricated the allegations. **See** N.T., 1/29/19, at 10 (Appellant's counsel arguing during motion in *limine* that Appellant's "argument is that the fabrication begins during the divorce, which is in 2008"). Thus, we conclude the court did not abuse its discretion when it permitted the Commonwealth to present these witnesses during its case-in-chief. Consequently, no relief is warranted on this claim.

In his final issue, Appellant insists the trial court imposed an illegal sentence when it failed to merge his convictions of IDSI with his convictions of rape for sentencing purposes, when the convictions are based on the same criminal acts. The Commonwealth concurs with Appellant's argument, and we agree. **See** Commonwealth's Brief at 3.

"'A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence,' for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Brown**, 159 A.3d 531, 532 (Pa. Super. 2017) (citation omitted). Although the merger of sentences is now governed by statute — 42 Pa.C.S § 9765[11] — Appellant was convicted of acts that occurred between 1995 and 1998. Therefore, we are guided by the case law applicable before the enactment of the statute. **See Commonwealth v. Baker**, 963 A.2d 495, 509 (Pa. Super. 2008) (applying pre-Section 9765 case law to offenses that occurred before effective date of that statute).

Prior to the adoption of Section 9765, the courts of this Commonwealth applied the elements test. Under that test, "the same facts may support multiple convictions and separate sentences for each conviction except in cases where the offenses are greater and lesser included offenses." **Commonwealth v. Anderson**, 650 A.2d 20, 22 (Pa. 1994), *superseded by* 42 Pa.C.S. § 9765.

> Our inquiry . . . is whether the elements of the lesser crime are all included within the elements of the greater crime, and the greater

---

[11] Enacted in 2002, Section 9765 provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

offense includes at least one additional element which is different, in which case the sentences merge, or whether both crimes require proof of at least one element which the other does not, in which case the sentences do not merge.

*Id.* at 24.

In **Commonwealth v. Lee**, 638 A2d 1006 (Pa. Super. 1994), *superseded by* 42 Pa.C.S. § 9765, this Court held that the defendant's separate convictions of rape and IDSI, based on the same "forcible acts of anal intercourse and . . . oral intercourse" merged for sentencing purposes. *See id.* at 1009. Because the definition of "sexual intercourse" for purposes of the rape statute included "intercourse per os or per anus," this Court concluded that "any act of forcible oral or anal sex is proscribed both by the rape and IDSI statutes." *Id.* at 1010. Further, when the act at issue involves only one penetration, a defendant cannot be subjected to "multiple punishments." *See id.* at 1014.

The same is true here. For each separate act, Appellant was charged with both rape and IDSI. Thus, we conclude his convictions of IDSI should have merged with his rape convictions for sentencing purposes.[12] Accordingly,

---

[12] We note the trial court relies on Section 9765 and states that each of the crimes of which Appellant was convicted "possesses an element or elements distinct from the other[s]." Trial Ct. Op. at 1. As noted above, however, when oral or anal intercourse is involved, the crimes of rape and IDSI contain the same statutory elements. The trial court also refers to the comments of the Commonwealth at the sentencing hearing, noting, "the district attorney explained why the counts did not merge." *Id.* However, upon review, it is clear the Commonwealth was discussing the fact that the counts of **indecent assault** did not merge with the counts of rape and IDSI because they involved separate acts. *See* N.T., 7/15/19, at 27-28. We agree.

we vacate his judgments of sentence for IDSI. Because these sentences were imposed to run concurrently, our ruling does not upset the court's overall sentencing scheme. *See Commonwealth v. Thur*, 906 A.2d 552, 569 (Pa. Super. 2006) (when appellate court's disposition does not alter the trial court's overall sentencing scheme, there is no need to remand). Thus, we need not remand for resentencing.

Accordingly, we vacate Appellant's judgment of sentence for his convictions of IDSI. In all other respects, we affirm.

Judgment of sentence vacated in part and affirmed in part. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/2021

- 22 -